Filed 6/20/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERTO ANTONIO MONTALVO,<br><br>Defendant and Appellant. | C078115<br><br>(Super. Ct. No. CRF123902) |

APPEAL from a judgment of the Superior Court of Yolo County, David W. Reed, Judge. Affirmed.

Stephen M. Hinkle, Retained Counsel for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Robert C. Nash, Deputy Attorney General, Eric L. Christoffersen, Supervising Deputy Attorney General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through VIII of the Discussion.

1

Posing as undercover police officers, defendant and a female associate committed two robberies. On one occasion, they took money from a couple at a hotel. On another occasion, they pretended to be conducting a prostitution sting operation and stole money from their target. In a hotel room where defendant was eventually arrested, police discovered rock cocaine and a glass smoking pipe.

Defendant was convicted of various crimes including robbery in the first degree (Pen. Code, §§ 211, 212.5, subd. (a))[1] and robbery in the second degree (§§ 211, 212.5, subd. (c)). After striking one of two prior serious felony conviction allegations, the trial court sentenced defendant to a determinate term of 25 years in state prison and a consecutive one-year term in county jail.

On appeal, defendant contends: (1) the evidence was legally insufficient to prove the "accomplished by means of force or fear" element of robbery; (2) in the alternative, his robbery convictions should be vacated because his conduct constituted violations of more specific statutes, obtaining money by false impersonation and false pretenses (§§ 530, 532), and thus a prosecution for robbery was preempted under the rule in *In re Williamson* (1954) 43 Cal.2d 651 (*Williamson*) (the *Williamson* rule); (3) the admission of a nontestifying victim's statement to a police officer, as relayed to the jury by the officer, was error because the statement was inadmissible testimonial hearsay, the admission of which violated defendant's right to confrontation; (4) the prosecutor committed misconduct in his closing argument by displaying to the jury a definition of force or fear and a corresponding case citation despite the trial court having expressly rejected that definition; (5) the trial court erred in imposing a prior serious felony enhancement on count 2 and imposing and staying the same enhancement on count 3; (6) the trial court erred in imposing a prior prison term enhancement pursuant to section

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

667.5, subdivision (b), because the trial court had granted defendant's application to redesignate the underlying conviction a misdemeanor; (7) the trial court erred in failing to stay execution of the sentences imposed on counts 7, 8, and 9 pursuant to section 654; and (8) the abstract of judgment must be corrected to reflect that the trial court stayed execution of the sentence imposed on count 3 pursuant to section 654. Additionally, while this appeal was pending, Senate Bill No. 1393 (Stats. 2018, ch. 1013) (Senate Bill 1393) amended sections 667, subdivision (a), and 1385, subdivision (b), effective January 1, 2019, to give courts the discretion to dismiss or strike a prior serious felony conviction enhancement for sentencing purposes. Defendant filed a supplemental brief urging us to remand the matter to afford the trial court the opportunity to exercise its discretion to strike the prior serious felony conviction enhancement imposed in this case, and in their supplemental brief, the People do not oppose defendant's request.

In the published portion of this opinion, we reject defendant's contention that there was insufficient evidence of the force or fear element of robbery. While we find the evidence of fear insufficient, we conclude the evidence of force sufficient to support the verdicts. We also reject defendant's contention that the assertedly more specific crimes of theft by false impersonation and false pretenses preempted the prosecution for robbery under the *Williamson* rule because neither of those crimes covers defendant's conduct as established by the evidence.

In the unpublished portion of this opinion, we agree that the admission of the statement of the nontestifying victim given to the investigating officer violated the confrontation clause, but the error was harmless. We also conclude there were sentencing errors, requiring us to: (1) strike the section 667, subdivision (a)(1), enhancements imposed on count 2 and imposed and stayed on count 3; (2) dismiss the section 667.5, subdivision (b), prior prison term enhancement; (3) order that execution of the sentences imposed on counts 8 and 9 be stayed pursuant to section 654; and (4) remand and order that the trial court impose a full-term sentence on count 3 and stay

3

execution thereof pursuant to section 654. Also, given the statutory change in section 667, subdivision (a), we remand for the trial court to consider whether to exercise its discretion to dismiss or strike that enhancement allegation pursuant to section 1385.

As so modified, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

By amended information, defendant was charged with two counts of robbery in the first degree (§§ 211, 212.5, subd. (a); count 1 (victim J.T.)), robbery in the second degree (§§ 211, 212.5, subd. (c); count 2 (victim J.N.)), burglary in the first degree (§§ 459, 460 subd. (a); count 3 (victims J.T. & I.A.)), possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 4), two counts of petty theft with a prior conviction (§§ 484, subd. (a), 488, 666, subd. (b); counts 5 & 6), possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1; count 7), and two counts of impersonating an officer (§ 146a, subd. (a); counts 8 & 9). In connection with count 3, the information alleged that, during the commission of the first degree burglary, another person not an accomplice to the crime was present in the premises within the meaning of section 667.5, subdivision (c)(21). The information further alleged that defendant had two prior strike convictions within the meaning of section 667, subdivision (e)(2), that he was previously convicted of a serious felony within the meaning of section 667, subdivision (a)(1), and that he served a prior prison term within the meaning of section 667.5, subdivision (b).

### The Prosecution's Evidence

#### The Pacific Adult Motel Incident

In June 2012, J.T. and his wife, I.A., were staying in a hotel in West Sacramento. J.T. and I.A. arrived at the hotel at approximately 10:00 p.m. They had been at a friend's house, and J.T. had been drinking beer and did not want to drive home. After J.T. and I.A. checked in and went to their room, someone knocked on the door. J.T. opened the

4

door and saw a thin woman with tattoos on her neck. The woman entered without invitation and offered the couple sex. J.T. said he was there with his wife and told the woman to leave. The woman lifted her blouse, displayed a badge, and said that she was an undercover police officer. I.A. testified that the woman also had a gun, but J.T. testified he did not see it.[2] The woman then spoke into a radio.

Approximately three minutes later, a man came into the hotel room and ordered J.T. to turn around and face the wall. According to I.A., the man identified himself as a police officer, though J.T. testified that the man did not identify himself as a police officer. I.A. testified that the man had a gun. She saw the gun when the man pointed it at J.T.'s back as J.T. was facing the wall. J.T. did not see a gun.

I.A. identified defendant at trial as the man who entered the hotel room. She also testified that his hair had been darker, but by the time of trial, it had "gone quite white." J.T. testified that it was possible that defendant was the man who came into the room, but stated that the man who came into the hotel room had darker hair.

Because J.T. thought defendant was a police officer, he complied with defendant's order to face the wall. The woman "put" I.A. in a corner of the room and told her not to look around. As J.T. was up against the wall, defendant grabbed J.T.'s neck, and, with his feet, spread J.T.'s feet apart. Defendant then searched J.T., saying that he wanted to see if J.T. had any drugs. Defendant asked J.T. if he was "here legally," and J.T. responded that his identification was in his wallet. Defendant removed J.T.'s wallet from J.T.'s pants pocket. J.T.'s wallet contained $100, which defendant took. Defendant then placed J.T.'s wallet back in his pants pocket. Defendant told J.T. to stay where he was, not to turn around, and not to leave the hotel room. Defendant and the woman then left. J.T. and I.A. went to the hotel office and asked for help.

---

[2] The officer who interviewed I.A. testified that his recollection was that he asked I.A. whether she saw the woman with a gun and that I.A. responded that she did not.

Rebecca Bailey was the manager at the Pacific Adult Motel in West Sacramento. She testified that two hotel guests, a man and a woman, approached her at the front desk indicating that they needed her to call the police. Although they did not speak English well, Bailey understood that they were upset. Bailey called the police.

Minutes earlier, Bailey had seen defendant and his girlfriend, Alicia Ortega, walking quickly from the area of J.T. and I.A.'s hotel room. Bailey knew defendant, as he had been a resident of the hotel for a couple of days.

Detective Kenneth Fellows, investigating the incident, learned of a similar occurrence from a fellow officer. Based on that information, Fellows created photographic lineups and showed them to J.T. and I.A. I.A. identified Ortega in one of the photo lineups as the woman involved in the incident. Neither J.T. nor I.A. identified anyone in a photographic lineup containing defendant's photo.

**The Prostitution Sting Incident**

Officer Manuel Cardoza of the West Sacramento Police Department testified that, at approximately 7:40 p.m. on September 16, 2012, he was dispatched to the corner of West Capitol Avenue and Harbor Boulevard. There, he met J.N., who had called 911. J.N. told Cardoza that he had offered to buy a woman a sandwich. J.N. then agreed to pay the woman money in exchange for a sex act. They went to an alley behind a Goodwill location, at which time a male approached, identified himself as a police officer, showed a badge, and ordered J.N. to step out of his car. The man searched J.N. and took his cell phone. The woman searched J.N.'s vehicle and took $400. The male then pretended to speak on his radio, as if there was an emergency. J.N. asked about the property they had taken from him. The two individuals told J.N. to go around the corner and contact uniformed officers who would give him his property back. The couple then left. When J.N. went around the corner, no one was there. J.N. was upset and angry. In giving the narrative to Cardoza, J.N. "jumped around quite a bit."

6

An audio recording of J.N.'s 911 call was played for the jury. In the recording, which began at 7:36 p.m., J.N. stated that he wanted to report a police impersonation and theft. J.N. reported that the incident occurred five to 10 minutes before his call, but closer to five minutes. He stated that, as soon as he realized what had happened, he "raced down here to use a telephone to report it."[3] J.N. stated that he "had picked [a] female up . . . then she flashed me a badge uh, told me that she was in - with the police and . . . her person that was with her uh, walked up uh, acted as if he were a policeman, got me out of my car uh, frisked me,[4] took my cell phone, took a large amount of money I had . . . in a pocket. About $400. Uh, maybe closer to 5. They directed me to . . . some squad units which were apparently around the corner and they weren't around the corner." J.N. stated that he had been with the female in the car when the male approached. When J.N. and the woman exchanged cash, the female told J.N. he was under arrest. J.N. said the individuals were purporting to arrest him for soliciting a prostitute, "[o]nly it was apparently a scam." J.N. described the perpetrators to the 911 operator.

J.N. was unavailable and did not testify at trial.[5]

---

[3] We have listened to the audio recording of the 911 call. There are discrepancies between the audio recording and the transcript of the 911 call, which was not admitted into evidence. At this point in the 911 call, the transcript inaccurately states that J.N. "*went* down here to use a telephone to report it," instead of "*raced* down here." (Italics added.)

[4] The transcript indicates that J.N. stated that the man "acted as if he was a policeman, got me out of my car uh, *pushed* me . . . " instead of "*frisked* me." (Italics added.)

[5] J.N.'s unavailability is not challenged in this appeal. The prosecutor explained during in limine motions that J.N. was receiving cancer treatment and lived out of state.

**The Arrest of Defendant and Ortega and Subsequent Searches**

Fellows obtained arrest warrants and arrested defendant and Ortega. At the time of his arrest, defendant had two bags of marijuana on his person. In the hotel room where Fellows arrested Ortega, he found cell phones, rock cocaine, marijuana, drug paraphernalia including a syringe and pipes, and a knife.

Fellows later searched a storage unit used by defendant and Ortega. Ortega told Fellows that items she and defendant used in impersonating officers were in that storage unit. In the storage unit, Fellows discovered a toy gun which looked like a black semiautomatic handgun and several radios that looked like police radios.

**Alicia Ortega's Testimony**

Alicia Ortega testified for the prosecution. She had entered a guilty plea to committing a robbery of J.N. in exchange for a 10-year prison sentence.

Ortega testified that she had previously been in a relationship with defendant, and that she was in a relationship with him when they robbed J.N. Ortega testified that it had been her intention to "rob a trick . . . ." She testified that she and defendant both had badges, which they had purchased at an army surplus store, and that she impersonated an officer.

Ortega encountered J.N. in the area of West Capitol Avenue and Harbor Boulevard. She directed J.N. to a particular location. J.N. and Ortega negotiated for Ortega to perform a sex act, and J.N. gave her $40. However, Ortega then got out of the car and displayed her badge, and defendant appeared and said, "West Sac P.D." Ortega told J.N. to exit the vehicle, and she "put" J.N. against the hood of the car. While Ortega patted J.N. down, defendant searched the vehicle. Ortega searched J.N.'s wallet. Ortega then pretended to receive another call, and she "basically . . . took off."

When Ortega returned to the room where she was staying with defendant, she had the $40 J.N. had given her for the sex act and defendant had $400 he had taken from J.N.

8

Ortega acknowledged that she had prior convictions for assault with a deadly weapon and robbery. She was addicted to heroin, methamphetamine, and "a few other drugs." She testified that, on the day police arrested her, the crack cocaine discovered in her room belonged to defendant.

On cross-examination, Ortega was asked if she had been involved in an incident at the Pacific Motel involving a Hispanic couple, and Ortega responded, "[p]robably."[6] Ortega testified that a Hispanic man approached her on West Capitol Avenue and asked her to come back to his room. The man offered methamphetamine in exchange for Ortega returning to the hotel room with him and having sex with him and his wife. Ortega went to the motel room with the man, and, a couple of minutes later, defendant knocked on the door. Ortega let defendant in, and they both displayed badges and pretended to be police officers. Ortega testified that she did not have a gun and that defendant did not use a gun that night.

## The Defense Evidence

Detective Alicia Slater, who worked in YONET, a Yolo County narcotics task force, testified that defendant was a confidential informant. Slater worked with defendant "more than anybody else . . ." over a two-year period. Slater testified that defendant was reliable and provided her with valuable information which led to a number of arrests. Slater stated that defendant was one of the best informants to ever work for her. There were occasions when both Slater and her partner put their lives in his hands. Slater also occasionally worked with Ortega as a confidential informant, but Ortega was not reliable. On the Sunday before defendant was arrested, he called Slater and told her that he had set up a drug deal, but that the dealer had come over and dropped off the drugs in his room. Slater instructed defendant to get rid of the drugs.

---

[6] Ortega testified that she did not remember the date of this incident. Earlier, when she testified about J.N., she said it was hard to remember the location "because  so many."

9

Defendant testified. He acknowledged that he had sustained a 2000 conviction for burglary in the second degree resulting in a state prison sentence.

At some point during his relationship with Ortega, defendant learned that she was a prostitute. He also discovered that she was using heroin when he came home one day and found her passed out on the floor with a needle in her arm. Defendant took Ortega to a methadone clinic to try to help her.

Defendant testified that, one night in June 2012, at approximately 1:00 a.m., he left his motel room with Ortega to go out and buy aspirin. As defendant hurried towards the store, which was about to close, he left Ortega behind. Defendant saw J.T. in front of the motel and noticed that he approached Ortega. Defendant entered the store and purchased aspirin and cigarettes. When he left the store, defendant noticed that J.T. and Ortega were no longer standing outside. As defendant walked back toward the motel, he saw J.T. and Ortega standing near one of the rooms. Ortega walked towards defendant while J.T. remained where he was, "looking at [Ortega], like, what's going on?" Ortega told defendant that "he thinks I am a bag whore," meaning someone who would have sex in exchange for drugs. Defendant said, "I know he didn't disrespect you like that," and Ortega told him to "[j]ust leave well enough alone." Defendant and Ortega returned to their room. Defendant was upset, and he went to J.T.'s room. Defendant knocked on the door, and someone inside told him, in Spanish, to come in. Defendant opened the door and stood at the threshold, not entering the room. He saw I.A. sitting on the bed, placing small plastic baggies containing what appeared to be methamphetamine into a plastic bag. Defendant then saw I.A. place a glass pipe in her bra. I.A. walked out of the room and placed her purse in her car. J.T. came towards defendant and asked what he wanted. Defendant responded: "if you ever ask my woman again to have sex with you for drugs, I know people and law enforcement will be glad to know you are over here selling dope." Defendant then went back to his room. Defendant testified that he did not have a badge,

10

a gun, or a radio, and he never actually entered J.T. and I.A.'s room. He testified that he never impersonated a law enforcement officer, and he did not take anything from J.T.

Regarding the incident involving J.N., defendant testified that he was getting something to eat at a restaurant on Harbor Boulevard when Ortega told him that a man had approached her and wanted to give her "a couple hundred dollars." Defendant told her no, that she was not going to do that, but Ortega would not listen to him and she jumped into someone's vehicle. As defendant ate, he grew concerned about Ortega. Defendant walked towards a location that Ortega knew defendant frequented, hoping that she would come and find him. Defendant saw Ortega getting out of a vehicle. Defendant walked towards Ortega, and he then saw J.N. getting out of the vehicle, zipping up his pants and walking towards Ortega. Defendant asked Ortega what was going on, but she walked away on West Capitol Avenue. J.N. advanced towards defendant and Ortega, and screamed, "Stop that whore bitch. That whore bitch, I just gave that bitch a substantial amount of money . . . ." Defendant tried to calm J.N. down, but J.N. said, "I know you know that bitch. You and her ripped me off for my sexual desires." He then threatened to call the police. Defendant told J.N.: "I didn't rip you off. I don't know what you are talking about, but if you've got a problem with what you and her does, if you want to talk to the policeman, there's plenty of policeman up and down West Capitol, there's plenty of policeman right there right in this parking lot." J.N. jumped into his vehicle and drove off. Defendant testified that he never told J.N. that he was a police officer, and he did not have a gun, badge, or handcuffs. Defendant never searched or touched J.N., and he did not search his vehicle or steal money from him.

Defendant testified that at the time he and Ortega were arrested, Ortega "had a bunch of paraphernalia . . ." in their hotel room. Defendant testified that the pipe discovered by police belonged to Ortega. Defendant also testified that he had never used rock cocaine. Defendant testified that, in connection with his work as an informant for YONET, a man had come to his room to show him rock cocaine that he was selling. The

11

man put the cocaine down and left. Initially, defendant did not realize that the man had left the cocaine in his room. When he realized that the man left the cocaine, defendant attempted to call the man back, but he could not get in touch with him. Defendant then called Slater. As defendant was talking to Slater, the man called back and said he would come to get the cocaine. Anticipating the man's return, defendant did not get rid of the cocaine, and he was arrested later that morning.

Defendant testified that the storage unit police searched was used by Ortega and other transient people. Defendant testified that he did not own transmitter radios. When shown photographs of radios and a replica gun found in the storage unit, defendant testified that he had never seen those items before.

### Verdict and Sentence

The jury found defendant guilty of robbery in the first degree (§§ 211, 212.5, subd. (a), count 1 (victim J.T.)), burglary in the first degree (§§ 459, 460, subd. (a), count 3 (victims J.T. & I.A.)), robbery in the second degree (§§ 211, 212.5, subd. (c), count 2 (victim J.N.)), possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a), count 4), possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1, count 7), and two counts of impersonating an officer (§ 146a, subd. (a), counts 8 & 9). The jury also found true the allegation that, during the commission of the burglary charged in count three, another person not an accomplice to the crime was present in the premises within the meaning of section 667.5, subdivision (c)(21).

Defendant waived jury trial on the enhancement allegations. The trial court found, beyond a reasonable doubt, that defendant had been convicted of two strikes within the meaning of section 667, subdivision (e)(2), that he was previously convicted of a serious felony within the meaning of section 667, subdivision (a)(1), and that he had previously served a prison term within the meaning of section 667.5, subdivision (b).

The trial court sentenced defendant to an aggregate term of 25 years in state prison and one consecutive year in county jail, calculated as follows: On count 1, robbery in the

12

first degree, the upper term of six years, doubled to 12 years based on a prior strike conviction,[7] plus a five-year enhancement pursuant to section 667 subdivision (a)(1); on count 2, robbery in the second degree, one year (one-third of the middle term), doubled to two years based on a prior strike conviction, plus a five-year enhancement pursuant to section 667, subdivision (a)(1)[8]; on count 3, burglary in the first degree, the middle term of 16 months, doubled to 32 months based on a prior strike, plus a five-year enhancement pursuant to section 667, subdivision (a)(1), with the sentence on count 3 stayed pursuant to section 654; on count 4, possession of a controlled substance, a concurrent term of one year in county jail as a misdemeanor;[9] on count 7, possession of controlled substance paraphernalia, a concurrent term of six months in county jail; on counts 8 and 9, impersonating a police officer, consecutive terms of six months in county jail on each count; and one year for the prior prison term enhancement pursuant to section 667.5, subdivision (b).

---

[7] The trial court granted defendant's *Romero* motion (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) to strike one of the prior strike enhancement allegations. The trial court struck the enhancement which was based on a 1983 aggravated kidnapping conviction.

[8] Defendant requested that the trial court impose only one five-year enhancement pursuant to section 667, subdivision (a)(1). However, the court stated that section 1385 specifically precluded it from dismissing an enhancement under section 667, subdivision (a)(1). The court stated that it did not believe it had the authority to grant defendant's request. We discuss this further in part V. of the Discussion, *post*.

[9] The trial court had granted defendant's request that count 4 be redesignated a misdemeanor.

**DISCUSSION**

**I. Legal Sufficiency of the Evidence of Force or Fear for Robbery Convictions**

**A. Defendant's Contentions**

Defendant contends that the evidence was legally insufficient to prove the element of force or fear to sustain his robbery convictions. According to defendant, the victims complied with his demands because they believed he was a police officer. Defendant contends that this does not give rise to any reasonable inference that he accomplished the taking of property by means of force or fear, and that, if anything, these incidents were thefts by false pretenses.

Surprisingly, there is a dearth of published cases discussing robbery involving defendants impersonating police officers. We conclude that while the evidence here was insufficient to establish a taking by means of fear, the evidence was legally sufficient to establish the that the takings were accomplished by means of force.

**B. Standard of Review and Applicable General Principles of Law**

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence— that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).)

"Robbery is 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' " (*People v. Williams* (2013) 57 Cal.4th 776, 781 (*Williams*), quoting § 211, italics omitted.) "In general, theft is the felonious taking, carrying, stealing, leading, or driving away of the personal property of another, or the appropriation

14

of property, labor or money by fraudulent means.  (§ 484.)  'The greater offense of robbery includes all of the elements of theft, with the additional element of a taking by force or fear.' " (*People v. Whalen* (2013) 56 Cal.4th 1, 69, disapproved on other grounds in *People v. Romero* (2015) 62 Cal.4th 1, 44, fn. 17.)  "This element is cast in the alternative; it may be accomplished either by force *or* by fear."  (*People v. Mullins* (2018) 19 Cal.App.5th 594, 604 (*Mullins*), italics added.)

Defendant does not dispute that he took the personal property in the possession of the victims from their persons or their immediate presence.  The only element at issue here is defendant's use of force or fear as a means by which to accomplish the takings.

### C.  Fear

#### 1.  The Fear Element

"The fear mentioned in Section 211 may be either:  [¶]  1.  The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or,  [¶]  2.  The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212.)

"To establish a robbery was committed by means of fear, the prosecution 'must present evidence "that the victim was *in fact afraid*, and that such fear allowed the crime to be accomplished." ' " (*People v. Morehead* (2011) 191 Cal.App.4th 765, 772 (*Morehead*), italics added.)  Thus, the fear element is subjective in nature.  (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319 (*Bordelon*).)  However, the victim need not explicitly testify that he or she was afraid of injury where there is evidence from which it can be inferred that the victim was in fact afraid of injury.  (*Ibid*., citing *People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709, fn. 2 (*Mungia*).)  "The fear is sufficient if it facilitated the defendant's taking of the property.  Thus, any intimidation, even without threats, may be sufficient."  (*Mullins*, *supra*, 19 Cal.App.5th at p. 604, citing *Morehead,*

15

at pp. 774-775.) However, given the language of section 212, the intimidation must not only produce fear, but the fear must be of the infliction of injury.

## 2. The Pacific Adult Hotel Incident

J.T. did not testify that defendant's actions placed him in fear, or that he surrendered property because he was afraid he or I.A. or their property would be injured. I.A. did testify that, during the encounter, she "was very scared" and that she "was frightened." However, defendant did not take anything from I.A., but instead only took property from J.T., and defendant did not accomplish a taking of money from J.T.'s wallet by instilling fear in I.A.

J.T. twice testified that he complied with defendant because J.T. "thought he was a police officer." He did not say he was afraid of being injured by defendant if he did not comply. Indeed, he was never even asked what he thought would happen if he did not comply. Nor did he testify that he suspected defendant might not be a police officer during the encounter. Although I.A. testified that the man who entered their hotel room displayed a gun, J.T. did not see a gun, apparently because his back was turned when defendant pointed the gun at him. Bailey testified that, when I.A. and J.T. approached her in the hotel office after the incident, they "seemed upset." But there was no follow-up with Bailey as to this observation or any other description of their demeanor.

As we have noted, the victim need not explicitly testify that he or she was afraid of injury where there is evidence from which it can be inferred that the victim was in fact afraid of injury. (*Bordelon, supra,* 162 Cal.App.4th at p. 1319; *Mungia*, *supra*, 234 Cal.App.3d at p. 1709, fn 2.) At trial and again on appeal, the People rely largely on the theory that defendant's representation of himself as a police officer was sufficient to establish the element of fear. In closing arguments, the prosecutor argued that, because defendant and Ortega posed as police officers, "the threat of force is implied. The threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced, thus the use of force is implied when . . . arrest is threatened."

16

The prosecutor further asserted that, "when the defendants pose as police officers, the victims know 'If I don't comply, they are going to beat me. You know, they are going to physically manhandle me. They are gonna maybe tase me, maybe even shoot me'. That's what gives officers their authority." On appeal, the People argue that the fact defendant identified himself as a police officer, thereby implying he had a gun, and his command not to move provided "sufficient intimidation to constitute the use of fear in the taking."

Defendant counters that the fact that the victims believed defendant to be a police officer was legally insufficient in itself to establish, beyond a reasonable doubt, that the victims were placed in fear of injury and defendant accomplished these takings by means of that fear. Defendant asserts that members of society, *as a general matter*, do not comply with police orders because the police place individuals in a state of fear, but because it is their civic duty to do so.

The People have not brought to our attention a case in which a defendant's representation that he or she was a police officer, *without more*, was sufficient to instill fear sufficient to support a robbery conviction. We have not found such a case through our own research, and we conclude *more* is indeed required. While an encounter with a supposed police officer might be frightening, this alone does not establish that any fear the victim suffered was fear of an injury. To prove the element of fear here, the prosecution was required to establish that the victim was placed in actual fear of injury.

In asserting that the evidence was legally sufficient to establish the element of fear, the People rely on a robbery case with some similarities to this one, in which the defendant posed as a police officer. In *People v. Gonzales* (2004) 114 Cal.App.4th 560 (*Gonzales*), the "defendant and another man approached [K.]. and [S.], who were towing a vehicle late at night. [The] defendant and his cohort claimed to be 'undercover cop[s]' and told [K.] that what he was doing was illegal. [K.]. was 'scared' at the time. [The] defendant pat searched [K.] and asked for his ID and wallet. [K.] *began to suspect that*

17

*[the] defendant was not a police officer and considered asking [the] defendant for a badge, but opted not to because he was 'scared' that [the] defendant could physically harm him*; *he also feared [the] defendant could have a gun*." (*Id*. at p. 570, italics added.) The Court of Appeal concluded that "the evidence was sufficient to support a finding that [the] defendant took [K.'s] property by means of fear of unlawful injury. [K] specifically testified that [the] defendant's actions and words placed him in fear of physical harm." (*Ibid*.)

While there are certain similarities between *Gonzales* and this case, there are also critical distinctions. J.T., the actual robbery victim here, did not testify he complied because he thought either defendant or Ortega were armed. Nor did he testify that he thought he would be injured or even that he was scared. Additionally, there was no evidence J.T. began to question whether defendant was, in fact, a police officer during the encounter and complied because he thought he would be injured if defendant was not a police officer. The type of evidence establishing the element of fear in *Gonzales* is absent here. There was simply no evidence from which it can be inferred that J.T. was in fear of injury or that the taking was accomplished by placing him in such fear.

The People also rely on *Morehead, supra*, 191 Cal.App.4th 765, which involved prosecution for several unarmed bank robberies and an attempted robbery by use of a note demanding money. One bank teller testified that she "panicked" and was "afraid." (*Id*. at p. 775.) In that incident, the defendant had produced a note that read, "Robbery 100s/50s." (*Ibid*.) During the crime, the defendant told the teller, "[h]urry, [h]urry." (*Ibid*.) In a second incident, another teller testified that she was "scared and nervous," and demonstrated fear of defendant at trial when she asked, " 'Do I have to look at him?'" after she was asked to make an in-court identification. (*Id*. at p. 776.) In that incident, the defendant produced a note that read, "This is a robbery," and when the teller tried to take the note, the defendant " 'snatched' " it back. Another teller observed the victim teller " 'frantically' " take the cash out of her drawer and hand it over to the defendant.

18

(*Ibid*.)  In a third incident, the defendant showed the teller a note demanding money.  The teller testified that she "got really nervous," was "afraid," and was "scared" that if she failed to comply with the defendant's demands, "something else could occur."  (*Ibid*.)  In a fourth incident, the teller testified that she was scared.  (*Id*. at p. 777.)  In that incident, the defendant held a note against the glass that read, " 'Robbery, no dye packs, second drawer.' "  (*Ibid*.)

The defendant in *Morehead* contended that the evidence was legally insufficient to support the element of force or fear for purposes of the robbery and attempted robbery convictions, particularly because all he did was hand the tellers a piece of paper demanding money and he never threatened anyone or displayed a weapon.  (*Morehead, supra*, 191 Cal.App.4th at p. 777.)  The Court of Appeal rejected the defendant's contentions, reasoning that the defendant "dressed in a partial disguise, entered the financial institutions and demanded money from the tellers.  The testimony of each victim regarding her reaction to [the defendant's] demand for money reflected a perception that she had no choice but to comply with his demand.  Any reasonable jury would conclude the tellers had no way of knowing what [the defendant] might do if they failed to comply, and their prompt compliance showed they viewed [the defendant's] demands as carrying an implicit threat he might harm them if they did not immediately hand money over to him.  The evidence strongly supports a conclusion that [the defendant's] demands engendered both actual and reasonable fear in the employees."[10]

---

[10] In addition to a substantial evidence review, the *Morehead* court concluded that the trial court did not have a sua sponte duty to amplify the robbery instruction by telling the jury that each victim's fear had to be both actual *and reasonable*.  (*Morehead, supra*, 191 Cal.App.4th at p. 774.)  The court then went on to hold that any error in not so instructing the jury was harmless because the evidence in the case supported a finding that their fear was indeed both actual and reasonable.  (*Id*. at pp. 774-777.)

19

(*Id*. at p. 778.)  The Court of Appeal concluded that substantial evidence supported the defendant's convictions of robbery and attempted robbery.  (*Ibid*.)

Ignoring the other circumstances in *Morehead*, the People here focus solely on the victims' compliance with the robbers' demands, arguing that their "prompt compliance showed they viewed [the defendant's] demands as carrying an implicit threat he might harm them if they did not immediately . . . let [defendant] take their property."  From this, the People argue that the evidence here "strongly supports a conclusion that defendant's demands engendered both actual and reasonable fear in the victims."  However, unlike in *Morehead*, there is no direct or circumstantial evidence here establishing that J.T. was in fear of injury and that the taking was accomplished by means of that fear.  We of course realize that direct evidence of fear is not necessarily required and fear of unlawful injury may be inferred from the circumstances.  (*People v. Holt* (1997) 15 Cal.4th 619, 690.)  *Morehead* is illustrative of this point.  The fear in *Morehead* was based on the implicit threat posed by a bank robber, who had announced by his notes his intent to take money.  *Morehead* does not support the People's position that the victims in this case were in fear of defendant injuring them because he identified himself as a police officer, or that the taking was accomplished by that fear.

One other case, *People v. Majors* (2004) 33 Cal.4th 321 (*Majors*), a kidnapping and kidnapping for rape prosecution, warrants discussion.  The prosecutor in the instant case relied upon *Majors* for a special instruction the trial court rejected and his argument to the jury was based on language from *Majors*.  In *Majors*, our high court held that the implicit threat of arrest satisfies the force or fear element for kidnapping "if the defendant's conduct or statements cause the victim to believe that unless the victim accompanies the defendant the victim will be forced to do so, and the victim's belief is objectively reasonable."  (*Id*. at p. 331.)  Section 207, subdivision (a), provides:  "Every person who *forcibly, or by any other means of instilling fear*, steals or takes, or holds, detains, *or arrests* any person in this state, and carries the person into another . . . county,

20

or into another part of the same county, is guilty of kidnapping." (Italics added.) The *Majors* court reasoned that "the threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced. Thus, the use of force is implicit when arrest is threatened." (*Majors*, at p. 331.)

In *Majors*, a kidnapping for rape case, the victim, a teenage female, encountered defendant when he flashed a badge and ordered her to stop. (*Majors, supra*, 33 Cal.4th at p. 324.) The defendant told her he had received a call about a theft from a store in a nearby mall and told the victim she would have to return with him to the store. (*Ibid*.) The victim testified that she complied and went with the defendant in his van because she was scared that if the defendant was who he claimed, she would be arrested. (*Ibid*.) However, he did not do anything to cause her to be afraid for her safety before she got into the van. (*Ibid*.)

The *Majors* kidnapping scenario is different from the scenario presented in the instant case. Kidnapping does not expressly require the fear of injury, but merely the fear that one's movement will be forced. Thus, fear of injury is not required for kidnapping. Indeed, in *Majors*, the victim expressly testified she did not fear for her safety. She only feared she would be arrested. (*Majors*, *supra*, 33 Cal.4th at pp. 324-325.) And the *Majors* court did not hold that there was substantial evidence of fear of injury, only that there was substantial evidence of fear the movement would be forced if the victim did not comply. (*Id*. at p. 331 ["there was substantial evidence here of force or fear, i.e., that [the victim] entered defendant's van under such implicit threat of arrest"].) Moreover, based on the plain wording of the statute, the purpose of using force or instilling fear is to steal, take, hold, detain, or *arrest* a person to move that person. Thus, the fear of arrest satisfies the fear element for kidnapping without the fear of injury. *Majors* does not support the People's fear theory in this robbery case where the fear element requires fear of injury.

We conclude there is not substantial evidence establishing the fear of injury element regarding the robbery of J.T.

21

### 3.  The Prostitution Sting Incident

The evidence of fear of injury is even less substantial concerning the robbery of J.N.  Here, again, the People rely solely on defendant having identified himself as a police officer and his act of displaying a badge.  But under the circumstances, this was insufficient to establish that J.N. was in fear of injury.  Moreover, J.N. never told anybody he was in fear during the incident.  No weapons were displayed.  There was no evidence in J.N.'s 911 call or his statement to the officer that he suspected defendant was not a police officer during the encounter.  Thus, there is no evidence, direct or circumstantial, from which it can be inferred that J.N. was in fear of injury.

We conclude there is not substantial evidence establishing the fear of injury element regarding the robbery of J.N.

### D.  Force

### 1.  The Prosecution's Trial Theory and the Instructions

Defendant insists that the "prosecutor did not proceed on the basis that [defendant] used force to accomplish the robberies."  We disagree.  While the prosecutor principally relied on the theory that defendant's impersonation of a police officer implied a threat of force, he also emphasized in closing that J.T. was forced against a wall.  He also reminded the jury that J.N. was "forced against the hood of the  car.  He was searched."  In his rebuttal argument, the prosecutor stated:  "Next the defense attacks the robbery . . . saying that there was no fear, there was no force that was used.  [¶]  Well, if you go back and listen to the testimony, [J.T.], he was forced up against the wall.  [J.N.] was forced up against his hood, so when this physical intimidation is force was used [*sic*]? [¶]  I mean, the issue of police personation aside, *there was actual physical force used*." (Italics added.)  Thus, contrary to defendant's contention, the prosecutor also relied on a theory of force as supporting the robbery convictions.

Moreover, the jury was instructed on force as well as fear. The trial court instructed the jury with CALCRIM No. 1600 on robbery.[11] That instruction informed the jury that, to support a robbery conviction, the People were required to prove, beyond a reasonable doubt, that "the defendant used force *or* fear to take the property or to prevent the person from resisting . . . ." (CALCRIM No. 1600, as given, italics added.) Thus, because the jury was free to reach guilty verdicts on a force theory, we look to whether there was substantial evidence of force to support those verdicts.

### 2. The Force Element

"[T]he 'force' required for robbery is not necessarily synonymous with a physical corporeal assault." (*People v. Wright* (1996) 52 Cal.App.4th 203, 210.) However, "[t]he law does require that the perpetrator exert some quantum of force in excess of that 'necessary to accomplish the mere seizing of the property.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 995 (*Anderson*).) "[T]he force need not be great." (*People v. Joseph* (2019) 32 Cal.App.5th 954, 962.) "An accepted articulation of the rule is that '[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance . . . .' " (*People v. Burns* (2009) 172 Cal.App.4th

---

[11] The trial court instructed the jury as follows: "The defendant is charged in Counts 1 and 2 with robbery. To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant took property that was not his own; [¶] Two, the property was in the possession of another person; [¶] Three, the property was taken from the other person or his or her immediate presence; [¶] Four, the property was taken against that person's will; [¶] Five, the defendant used force or fear to take the property or to prevent the person from resisting; and [¶] Six, when defendant used force or fear to take the property, he intended to deprive the owner of it permanently. [¶] The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery. [¶] The property taken can be of any value, however, slight. [¶] Fear as used here means fear of injury to the person himself or herself." (CALCRIM No. 1600, as given)

23

1251, 1259 (*Burns*); accord, *Mullins*, *supra*, 19 Cal.App.5th at p. 604 ["the degree of force need only be sufficient to overcome the victim's resistance"].)

For example, in *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246 (*Garcia*), disapproved on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 365, footnotes 2 and 3, the defendant approached a cashier in a market as she stood in front of an open cash register. Defendant "lightly pushed" his shoulder against the cashier's shoulder, " 'like a tap.' " Feeling this, the cashier moved away from the register. The defendant took money from the register and left. (*Garcia*, at pp. 1244-1245.) Rejecting the defendant's claim that he was entitled to an instruction on a lesser included offense of theft because the touching was incidental and insufficient to establish force, the *Garcia* court reasoned that the defendant's conduct went beyond the quantum of force necessary to grab the money. (*Id*. at pp. 1245-1246.)

In *Mullins*, *supra*, 19 Cal.App.5th 594, the defendants were charged with robberies at ATMs. In one of the robberies, just before the victim was going to push the ATM button indicating he did not want another transaction, the defendant pushed the victim aside. (*Id*. at p. 599.) He then took the victim's place in front of the ATM and withdrew money from the victim's account. (*Ibid*.) Noting that the victim had variously described the defendant's conduct as nudging or shoving him away from the ATM, a panel of this court concluded that this force was sufficient to overcome the victim's resistance and thus was sufficient to establish robbery even without a showing of fear. (*Id*. at p. 604.) In a second incident, the victim turned back to the ATM after realizing he had not pushed the button indicating he had finished his transaction, but, by then, the defendant had situated himself in front of the ATM. When the victim reached over to see if he had logged off, the defendant "pushed his body in front of" the victim, "pushed [the victim's] hands away" and informed the victim he was using the ATM. Thereafter, he withdrew money from the victim's account. (*Id*. at p. 600.) This court concluded that this conduct

24

also supported a finding of force—"force in pushing [the victim's] hands away so he could not finish his business at the ATM." (*Id*. at p. 605.)

With these principles and examples in mind, we now turn to the evidence of force in this case.

### 3. The Pacific Adult Motel Incident

Here, the physical force used on J.T. was more substantial than that employed by the defendants in either *Garcia*, *supra*, 45 Cal.App.4th 1242, or *Mullins*, *supra*, 19 Cal.App.5th 594. J.T. testified that, after the man posing as a police officer entered his hotel room, the man "*grabbed [J.T.] by the neck*, and with his feet he opened [J.T.'s] feet" and searched J.T. I.A. testified that defendant "*grabbed* [J.T.] and put him against the wall with his hands against the wall." (Italics added.) I.A. also testified that defendant "was acting like a policeman because he separated his feet and then he put his arms up above." Defendant then took money from J.T.'s wallet.

Viewing the evidence in the light most favorable to the prosecution (*Banks, supra*, 61 Cal.4th at p. 804), we conclude that this evidence was legally sufficient to prove that defendant employed force in his encounter with J.T. and that he accomplished a taking from J.T. by means of using that force. The force defendant used exceeded the amount of force " 'necessary to accomplish the mere seizing of the property,' " (*Anderson, supra*, 51 Cal.4th at p. 995; *Mullins*, *supra*, 19 Cal.App.5th at p. 604), specifically the removal of J.T.'s wallet and the taking of cash therefrom. A rational trier of fact could have found, beyond a reasonable doubt, that the force defendant employed was sufficient to overcome J.T.'s resistance. (*Mullins*, at p. 604; *Burns, supra*, 172 Cal.App.4th at p. 1259.)

Thus, there was substantial evidence of force to support the conviction of robbery in the first degree charged in count 1.

### 4. The Prostitution Sting Incident

In his 911 call, J.N. stated that, after Ortega flashed her badge, an individual approached him acting as if he was a police officer, "got [J.N.] out of [his] car . . . , *frisked* [him], took [his] cell phone, took a large amount of money [J.N.] had . . . in a pocket." (Italics added.)  Ortega's testimony was slightly different in that she testified she ordered J.N. out of the car and frisked him.  She also testified that she "put" J.N. on the hood of his car.  While she frisked J.N., defendant searched the vehicle.  She testified that it was defendant who obtained the victim's $400.  The trial court instructed the jury with CALCRIM No. 400 on the general principles of aiding and abetting,  and with CALCRIM No. 401 on aiding and abetting intended crimes.

Viewing this evidence in the light most favorable to the prosecution (*Banks, supra*, 61 Cal.4th at p. 804), we conclude that the evidence was legally sufficient to prove, beyond a reasonable doubt, that defendant and Ortega employed force in the encounter with J.N., and that the taking from J.N. was accomplished by means of using that force. The act of "put[ting]" J.N. on the hood of his car and the separate act of frisking him each exceeded the amount of force " 'necessary to accomplish the mere seizing.' " (*Anderson, supra*, 51 Cal.4th at p. 995; *Mullins*, *supra*, 19 Cal.App.5th at p. 604)  A rational trier of fact could have found, beyond a reasonable doubt, that the force employed was sufficient to overcome J.N.'s resistance.  (*Mullins*, at p. 604; *Burns, supra*, 172 Cal.App.4th at p. 1259.)

Therefore, there was substantial evidence of force to support defendant's conviction of robbery in the second degree in count 2.

## II.  Application of the *Williamson* Rule

### A.  Defendant's Contention

Defendant contends that the Legislature has enacted more specific statutes for punishing the conduct in which he engaged.  He argues that, where a general statute proscribes the same conduct as a special statute, the special statute controls.  According

to defendant, under the rule established in *In re Williamson, supra*, 43 Cal.2d 651, section 530, false personation, and section 532, false pretenses, are more specific statutes than section 211, robbery, and thus defendant could not be convicted of robbery.

We conclude that the *Williamson* rule does not apply here.

### B. Analysis

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute *for conduct that otherwise could be prosecuted under either statute*. [Citation.] 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' [Citation.] 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . ." ' " (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*), italics added.)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' [Citation.] In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute." (*Murphy, supra*, 52 Cal.4th at p. 86.)

27

"On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute.  In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely."  (*Murphy, supra*, 52 Cal.4th at p. 87.)

"However, that the general statute contains an element not within the special statute does not necessarily mean that the *Williamson* rule does not apply.  'It is not correct to assume that the [*Williamson*] rule is inapplicable whenever the general statute contains an element not found within the four corners of the "special" law.  Rather, the courts must consider the *context* in which the statutes are placed.  If it appears from the entire context that a violation of the "special" statute will necessarily or commonly result in a violation of the "general" statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' " (*Murphy, supra*, 52 Cal.4th at p. 87.)

The underlying rationale of the *Williamson* rule reveals something pertinent to our analysis here the parties have not mentioned.  In discussing the underlying rationale for the rule, our high court has stated: "In adopting a specific statute, the Legislature has *focused its attention on a particular type of conduct and has identified that conduct* as deserving a particular punishment.  Consequently, we infer that the Legislature intended that *such conduct* should be punished under the special statute and not under a more general statute."  (*Murphy*, *supra*, 52 Cal.4th at p. 91, italics added.)  The focus on the defendant's conduct is important.  Because the *Williamson* rule "prohibits prosecution under a general statute when the *conduct at issue is covered under a more specific statute*" (*People v. Henry* (2018) 28 Cal.App.5th 786, 789, italics added), a necessary predicate to the application of the rule is that the defendant's conduct fits the elements of

28

the assertedly more specific statute. Here, defendant's conduct is not covered by the statutes defendant relies upon and thus, defendant could not be convicted under either statute.

Section 530 provides: "Every person who falsely personates another, in either his private or official capacity, and in such assumed character *receives any money or property, knowing that it is intended to be delivered to the individual so personated*, with intent to convert the same to his own use, or to that of another person, or to deprive the true owner thereof, is punishable in the same manner and to the same extent as for larceny of the money or property so received."[12] (Italics added.) Defendant asserts that section 530 "is precisely what happened here." We disagree. As can be seen by the italicized text, this statute does not cover defendant's conduct. Defendant did not *receive* property; he *took* it. Moreover, there is no evidence the victims intended to deliver their money and property to the person defendant personated, let alone defendant's knowledge of such intent. The evidence simply does support a finding that defendant committed a violation of section 530.[13]

Defendant's section 532 theory fails for the same reason. Section 532, subdivision (a), provides, in pertinent part: "Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor,

---

[12] There are no published cases setting forth the elements of section 530. However, CALCRIM No. 2044 does. That instruction lists the following elements: "1. The defendant falsely impersonated another person in the other person's private or official capacity; [¶] 2. While falsely impersonating that person, the defendant: [¶] 2E. *Received* money or property; [¶] 2F. The defendant *knew that the money or property was intended to be delivered* to the person that (he/she) was falsely impersonating; [¶] 2G. The money or property was worth (more than $950/$950 or less); [¶] 2H. When the defendant acted, (he/she) intended to deprive the true owner of the money or property, or use it for (his/her) own benefit, or let someone else use it." (Italics added.)

[13] We disagree with the People's unwarranted concession that the facts here arguably could support false personation convictions.

29

or property, whether real or personal, or who causes or procures others to report falsely of his or her wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets possession of money or property, or obtains the labor or service of another, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained."  Again, defendant asserts that section 532 "is precisely what happened here."  Again, defendant is wrong.

As defendant notes, the elements of theft by false pretense were set forth by the court in *People v. Wooten* (1996) 44 Cal.App.4th 1834:  "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) *the owner transferred the property* to the defendant in reliance on the representation."  (*Id*. at p. 1842.)  Thus, theft by false pretenses under section 532 "is the *consensual* but fraudulent acquisition of property from its owner." (*Bell v. Feibush* (2013) 212 Cal.App.4th 1041, 1049; see also *People v. Kaufman* (2017) 17 Cal.App.5th 370, 380 [false pretenses under section 484 also involves the consensual transfer of property].)  Here, again, there was no consensual transfer of property. Defendant took the property.

Defendant's conduct is not covered by sections 530 or 532.  Thus, he could not be convicted of these assertedly more specific statutes.  Accordingly, a prosecution for robbery cannot be preempted under the *Williamson* rule by offenses defendant did not commit.

Additionally, we note that robbery is both a serious and violent felony offense. (§§ 667.5, subd. (c)(9); 1192.7, subd. (c)(19).)  Therefore, here, we do not assume that the Legislature intended to preclude prosecution under that assertedly general statute. Rather, "because the general statute [robbery] contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." (*Murphy, supra*, 52 Cal.4th at p. 87; see also *People v. Watson* (1981) 30 Cal.3d 290, 297 [prosecution for second degree murder under an implied malice theory for vehicular

homicide not preempted by the offense of vehicular manslaughter with gross negligence because the prosecution is required to show a higher degree of culpability in support of a second degree murder charge than required to establish vehicular manslaughter; because the two crimes contemplate different kinds of culpability or criminal activity, the *Williamson* rule does not preclude a second degree murder charge].)

We conclude that the *Williamson* rule is inapplicable here.

### III.  Admission of J.N.'s Statement to Officer Cardoza

### A.  Additional Background

At the time of trial, J.N. was unavailable to testify.  The trial court conducted an Evidence Code section 402 hearing to determine whether J.N.'s statements to Cardoza, the responding officer, were admissible.  At the hearing, Cardoza testified largely consistently with his later trial testimony.  The trial court concluded that, while Cardoza's testimony concerning J.N.'s statements did constitute hearsay, the statements were admissible under the spontaneous statement exception (Evid. Code, § 1240) to the hearsay exclusionary rule.

The trial court then considered whether the statements were inadmissible testimonial hearsay under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*).  The trial court concluded that, under *Crawford* and subsequent case law, J.N.'s statements were not testimonial, and therefore the introduction of these statements did not violate the confrontation clause of the Sixth Amendment or *Crawford*.

Thus, the trial court ruled that Cardoza's testimony concerning J.N.'s statements was admissible at trial.

### B.  Defendant's Contentions

Defendant asserts that the admission of J.N.'s statements to Cardoza was error because his statements constituted inadmissible hearsay that did not qualify under the spontaneous statement exception to the hearsay exclusionary rule.  Relying on *Crawford*, *supra*, 541 U.S. 36, defendant also asserts that the statements constituted testimonial

31

hearsay, and that the admission of these statements violated his confrontation clause rights. Defendant asserts that the error in admitting J.N.'s statements to Cardoza at trial was prejudicial.[14]

We conclude that while the trial court correctly determined that J.N.'s statements to Cardoza qualified under the spontaneous statements exception to the hearsay exclusionary rule (Evid. Code, § 1240), the prosecution failed to establish that the statements were nontestimonial. Therefore, we conclude the admission of the statements violated defendant's rights under the confrontation clause of the Sixth Amendment. However, we further conclude that this error was harmless beyond a reasonable doubt.

### C. Spontaneous Statement Exception—Evidence Code Section 1240

The spontaneous statement exception to the hearsay exclusionary rule is codified in Evidence Code section 1240. That section provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

The admissibility requirements for out-of-court statements under the spontaneous statement exception to the hearsay exclusionary rule are well established. " ' "(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.] A statement meeting these requirements is 'considered trustworthy, and

---

[14] Defendant does not "take issue with the admission of [the 911] call, but only the later statement to Officer Cardoza."

admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 64 (*Merriman*); *People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)

"A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.' [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication. [Citations.] . . . [T]hese factors 'may be important, but solely as an indicator of the mental state of the declarant.' [Citation.] For this reason, no one factor or combination of factors is dispositive." (*Merriman, supra*, 60 Cal.4th at p. 64.) "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811.)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*Merriman, supra*, 60 Cal.4th at p. 65.)

We conclude that the statements at issue here satisfy each of the three requirements to qualify as a spontaneous statement. J.N.'s statements to Cardoza described an incident in which two individuals impersonated police officers, got him out

33

of his car, forced him on the hood, stole money and a cell phone from him, and fled.  This constitutes an " ' "occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting." ' " (*Merriman, supra*, 60 Cal.4th at p. 64; *Poggi, supra*, 45 Cal.3d at p. 318.)

Contrary to defendant's contentions, we also conclude that J.N. gave his statements before there was " ' "time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." ' " (*Merriman, supra*, 60 Cal.4th at p. 64; *Poggi, supra*, 45 Cal.3d at p. 318; cf. *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1525 [rape victim who reported rape several hours after incident and after contact with several people was able to deliberate and reflect on what had occurred and thus statements made to third parties were not admissible as spontaneous statements].)  Again, the time factor, like the other factors, is important "solely as an indicator of the mental state of the declarant." (*Merriman*, at p. 64.)

When J.N. placed his call to 911 at 7:36 p.m., he stated that the incident occurred five to ten minutes before his call, but closer to five minutes.  As soon as he realized what had happened, he "raced down here to use a telephone to report it."  At the Evidence Code section 402 hearing on the admissibility of J.N.'s statements to Cardoza, Cardoza testified he was dispatched to the location at approximately 7:40 p.m.  Cardoza testified that "[p]robably five minutes" elapsed between the time he received the dispatch call to the time that he arrived at the location.  Based on this evidence, it would appear that only approximately 14 minutes passed between the time of the incident (7:31) and when J.N. began to make his statements to Cardoza (7:45).

As to the third requirement, J.N.'s statements to Cardoza related to " ' "the circumstance of the occurrence preceding it." ' " (*Merriman, supra*, 60 Cal.4th at p. 64; *Poggi, supra*, 45 Cal.3d at p. 318.)

Cardoza testified at the Evidence Code section 402 hearing that J.N. was "upset angry." At trial, he again testified that J.N. was "upset and angry." This supports the conclusion that J.N. was "still under the stress and excitement of the startling event," and spoke to Cardoza "before there was 'time to contrive and misrepresent.' " (*Merriman, supra*, 60 Cal.4th at p. 64.) Additionally, even if J.N. gave his statements to Cardoza in response to questioning by Cardoza, this would not render J.N.'s statements nonspontaneous.[15] (*Poggi, supra*, 45 Cal.3d at pp. 319-320.)

In ruling that J.N.'s statements to Cardoza qualified under the spontaneous statement exception to the hearsay exclusionary rule, the trial court found that J.N.'s statements were spontaneous "based upon the time it was provided, [and] the emotional state or demeanor of the declarant at the time it was made . . . ." On this record, we conclude that the trial court did not abuse its discretion in ruling that the spontaneous statement exception to the hearsay rule applied. (*Merriman, supra*, 60 Cal.4th at p. 65.)

Defendant emphasizes that there were differences in J.N.'s account of the incident to the 911 operator and what he reported to Cardoza. J.N. told the 911 operator that the male got him out of the car, frisked him, took his cell phone, and took money from him. However, J.N. reported to Cardoza that the man searched him and took his cell phone, while the woman searched his vehicle and took $400. (1 RT 221) While we recognize this difference in J.N.'s accounts of the incident, those accounts were otherwise largely consistent. We are not persuaded that this difference undermines the trial court's conclusion that J.N.'s statements constituted spontaneous statements within the meaning of Evidence Code section 1240. Indeed, the trial court could have reasoned that the

---

[15] We note that most of the information J.N. provided to the 911 dispatcher was pursuant to questions and defendant appropriately does not challenge the admissibility of those statements.

35

differences were a product of J.N.'s excitement.  As Cardoza noted, J.N. "jumped around quite a bit" in giving his narrative.

We conclude that the trial court did not abuse its discretion in determining that these statements qualified as spontaneous statements within the meaning of Evidence Code section 1240.

## D.  *Crawford* and Testimonial Hearsay

"*Crawford* held that, in general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination."  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214.)  However, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial."  (*Ohio v. Clark* (2015) 576 U.S. ___ [192 L.Ed.2d 306, 315].)  Under *Crawford*, the confrontation clause reaches *all* out of court statements, including hearsay statements that are otherwise admissible under a hearsay exception, unless the statements are nontestimonial.  (*Crawford, supra*, 541 U.S. at pp. 50-51, 56 & fn. 7; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1463.)  Thus, even though J.N.'s statements to Cardoza were admissible as a general matter under Evidence Code section 1240, they could still be barred under the confrontation clause if they were testimonial.

As our state's high court has recognized, the United States Supreme Court has not provided a clear definition of "testimonial."  (E.g., *People v. Leon* (2015) 61 Cal.4th 569, 603 (*Leon*).)  However, the California Supreme Court has "discerned two requirements.  First, 'the out-of-court statement must have been made with some degree of formality or solemnity.'  [Citation.]  Second, the primary purpose of the statement must 'pertain[ ] in some fashion to a criminal prosecution.' "  (*Ibid.*)  "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . , or for some primary purpose other than

36

preserving facts for use at trial." (*People v. Sanchez* (2016) 63 Cal.4th 665, 694 (*Sanchez*).)

Based on the reasoning in *Michigan v. Bryant* (2011) 562 U.S. 344 [179 L.Ed.2d 93] our high court identified several factors to consider in determining whether a statement is given for the primary purpose of criminal prosecution: (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the parties; (2) whether an ongoing emergency existed, or appeared to exist, when the statement was made; (3) the factual context of any ongoing emergency, such as whether a threat to first responders or the public still existed even if the threat to the initial victim had abated; (4) the medical condition of the declarant; (5) whether, due to evolving circumstances, the apparent emergency ended, for example shifting the focus from coping with the emergency to gathering evidence for trial; and (6) the formality or informality of the statement and the circumstances surrounding its acquisition. (*People v. Blacksher* (2011) 52 Cal.4th 769, 814-815 (*Blacksher*); see also *People v. Chism* (2014) 58 Cal.4th 1266, 1289 (*Chism*).)

Because defendant timely objected to the admission of J.N.'s statements to Cardoza by in limine motion raising Sixth Amendment confrontation clause claims, the prosecution, "as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause," bore the burden of establishing the admissibility of the subject evidence by, inter alia, establishing that it was not testimonial hearsay. (*Idaho v. Wright* (1990) 497 U.S. 805, 816 [111 L.Ed.2d 638, 652-653] (*Wright*).)

Here, based on the record before us, we cannot say J.N.'s statements were nontestimonial. Cardoza responded to J.N.'s location following J.N.'s 911 call, during which he reported that two individuals had stolen money and his cell phone from him. J.N. told the 911 operator that he did not see any weapons during the incident. There was no mention of any weapon in Cardoza's testimony concerning J.N.'s statements. Additionally, when Ortega described the encounter with J.N., she did not state that any

37

weapons were involved. While J.N.'s 911 call and his statements to Cardoza indicated that the perpetrators took money from him, those statements did not indicate that they employed violence or threatened J.N.

Regarding the question of whether there was an ongoing emergency, the Evidence Code section 402 hearing reveals none. Based on J.N.'s account, criminals were at large, criminals who were willing to impersonate police officers. However, J.N. was not injured. Cardoza testified he did not even learn how much time elapsed between the incident and his encounter with J.N., a fact that would seem important in determining whether there was an ongoing emergency or whether any exigency had subsided. And there was no testimony about what he did with the information J.N. supplied. For example, he did not testify that he provided that information to dispatch, which in turn was relayed to patrol units on the street. He did not testify that patrol units immediately began looking for the perpetrators or otherwise assisted him. The absence of any indication that these individuals had weapons or were otherwise violent or threatening further cuts against a conclusion that there was an ongoing emergency Cardoza sought to address by obtaining information from J.N. Furthermore, based on the conduct as reported by J.N., the perpetrators would not appear to have posed any threat to first responders or to the public at large. Based on J.N.'s account, the only danger posed by the perpetrators would be that they would employ their scheme on other potential victims.

Finally, the formality of J.N.'s statements and the circumstances surrounding their acquisition remain an issue. As *Leon* and the United States Supreme Court cases cited therein suggest, the degree of formality or solemnity with which the statements are made is one of the two primary considerations in determining whether a statement as a general matter is testimonial. (*Leon, supra*, 61 Cal.4th at p. 603.) Here, the record fails to shed light on the degree of formality and solemnity attached to the statements. While the People assert that there "was no formality of a *Crawford* police interrogation," the prosecutor did not establish as much during the Evidence Code section 402 hearing.

38

Indeed, we know very little about the circumstances of the interview, except that Cardoza testified that he met with J.N. in the parking lot of a Goodwill facility. Nothing more can be gleaned from the Evidence Code section 402 hearing.

As we have noted, the burden was on the prosecution to establish that J.N.'s statements were non-testimonial. (*Wright, supra,* 497 U.S. at p. 816.) Upon consideration of the two requirements for a statement to qualify as testimonial (*Leon, supra*, 61 Cal.4th at p. 603), as well as the pertinent factors set forth in *Blacksher* to be considered in determining whether a statement to law enforcement was given for the primary purposes of a criminal prosecution (*Blacksher, supra*, 52 Cal.4th at pp. 814-815), we conclude that the prosecution failed to meet its burden of demonstrating that J.N.'s statements to Cardoza were nontestimonial.

The People rely on *Chism, supra*, 58 Cal.4th 1266, in asserting that admission of the statements did not violate the confrontation clause. In *Chism*, a witness was sitting on a bus bench outside of a liquor store. (*Id*. at p. 1281.) After two men entered the store, the witness heard a popping sound he believed to be a gunshot, and then he saw the same two men run from the store. (*Ibid*.) The witness ran into the liquor store and found the clerk on his back, unconscious and bleeding. (*Ibid*.) Thereafter, the witness called the police and provided descriptions of the two men during the call. (*Ibid*.) He also described these events to Officer Romero, the first police officer to arrive at the scene, minutes after the shooting. (*Id*. at pp. 1287, 1289.) Upon arriving on the scene, Romero radioed for police assistance and after checking on the victim, the other responding officer radioed for paramedics and additional police assistance. (*Id*. at p. 1287.) In concluding that Romero's testimony concerning the witness's statements were nontestimonial, our high court stated: "Officer Romero was the first officer to arrive at the scene, and [the witness] was the first person he contacted. [The witness] appeared to be 'very nervous' and 'shaken up.' The circumstances of the encounter, which took place outside a store where a shooting had recently occurred, reveal that [the witness] and

Officer Romero spoke to each other in order to deal with an ongoing emergency. It was objectively reasonable for Officer Romero to believe the suspects, one of whom presumably was still armed with a gun, remained at large and posed an immediate threat to officers responding to the shooting and to the public. We are convinced that Miller's additional statements concerning his observations and descriptions of the suspects were made for the primary purpose of meeting an ongoing emergency and not to produce evidence for use at a later trial." (*Chism*, at p. 1289.)

The People also rely on *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*). In *Romero*, police officer Kevin Burke testified as to statements made by a victim whose finger had been injured when defendant attacked him with a small ax.[16] (*Id*. at pp. 420-421.) A few minutes later, other police officers working with Burke located the defendant and an accomplice hiding in some bushes down the street. (*Id*. at p. 421.) The victim identified the perpetrators five minutes after Burke had first encountered the victim. (*Ibid.*) By the time of trial, the victim was deceased. (*Ibid*.) Our high court concluded that, even if the right to confront and cross-examine witnesses applies at the penalty phase of a capital trial, the defendant's rights were not violated. (*Ibid*.) In concluding that the victim's statements were not testimonial, our high court stated: "Officer Burke, responding to an emergency call, encountered an agitated victim of a serious assault, who described defendant's attack on him with a small ax. The statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. The statements were not made primarily for the purpose of producing evidence for a later trial and thus were not testimonial. The same is true of the statements pertaining to identification. The primary purpose of the police in

_____

[16] This evidence was presented at the penalty phase of the defendant's trial.

asking [the] victim . . . to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Id.* at p. 422.)

The People assert that the "facts in the instant case are sufficiently similar to the facts in *Chism* and *Romero* to support the trial court finding that the statements made by J.N. to . . . Officer Cardoza were not testimonial." We disagree. In *Chism* and *Romero*, the statements made by unavailable witnesses involved a shooting murder (*Chism, supra*, 58 Cal.4th at pp. 1281, 1289) and an ax attack (*Romero, supra*, 44 Cal.4th at pp. 420-422), which, in each case, had occurred only minutes earlier. In both instances, the armed attackers remained at large. In both cases, additional officers were called to deal with the ongoing emergency. Here, it appears that Cardoza simply took a report and the record reflects no immediate efforts to apprehend the perpetrators. The witnesses' statements in both *Chism* and *Romero* addressed ongoing emergencies involving armed individuals who posed a danger to first responders and the public at large. Here, as we have discussed, the record does not establish an ongoing emergency.

Because the prosecution failed to satisfy its burden of demonstrating that J.N.'s statements to Cardoza were nontestimonial, the trial court erred in admitting these statements.

### E. Prejudice

"Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless." (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 655, citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).) Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may

41

confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*).) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671, italics added, citing *People v. Aranda* (2012) 55 Cal.4th 342, 367.) We conclude that the error in admitting J.N.'s testimonial statements to Cardoza was not prejudicial under this standard.

J.N.'s improperly admitted statements to Cardoza were largely consistent with J.N.'s statements to the 911 operator and Ortega's testimony. It is true, as defendant asserts, that there were differences between each of these accounts. In the 911 call, J.N. indicated that the male got him out of his car, frisked him, and took $400-$500 from him, as well as his cell phone. In her testimony, Ortega testified that *she* "put" J.N. on the hood of the car, patted J.N. down, and searched his wallet while defendant searched the vehicle. According to Cardoza, J.N. told him that the male showed a badge and had him step out of the car, but that the woman took $400 from inside the car.

We note that defense counsel argued these inconsistencies to the jury as a reason to disbelieve J.N.'s statements. In this way, defendant benefited from the admission of the statements to Cardoza, because if the statements to Cardozo had been precluded, the inconsistent statement argument would not have been available to the defense and the 911 call would have come in unchallenged.

Finally, defendant put himself at the scene in his own testimony. As for his implausible version of the incident, the jury clearly rejected his account.

Based on all of the evidence properly before the jury, we conclude, beyond a reasonable doubt, that the admission of J.N.'s statements to Cardoza, with its slightly differing details, did not contribute to the jury's decision. (*Chapman, supra*, 386 U.S. at p. 24.) A rational jury would have found the defendant guilty absent the admission of the statements to Cardoza. (*Geier, supra*, 41 Cal.4th at p. 608; *Livingston, supra,* 53 Cal.4th at p. 1159.) Therefore, we conclude that the error in admitting J.N.'s testimonial hearsay statements to Cardoza was harmless beyond a reasonable doubt.

## IV. Prosecutorial Misconduct

### A. Additional Background

The prosecution requested additions to CALCRIM No. 1600, which sets forth the elements of robbery. The prosecutor asserted that, as written, CALCRIM No. 1600 fails to account for an implied threat of force. The prosecutor relied on a case stating that police officers, with their authority to detain and arrest, occupy a unique place in society, and that "[t]hose who challenge an officer's actions do so at their peril . . . ." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 206.) He also relied on *Majors, supra*, 33 Cal.4th at p. 331, where the court said "the threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced. Thus, the use of force is implicit when arrest is threatened." The prosecutor proposed that the quoted language from *Majors* be added to CALCRIM No. 1600.

Defendant opposed the addition of this language. Defendant noted that *Majors* was a kidnapping-for-rape case, not a robbery case. Defendant further stated that the language the People sought to add was not part of any jury instruction in *Majors*.

The prosecutor replied that the terms "force or fear" are "the same terms used in both robbery and the rape case." He asserted that CALCRIM No. 1600, as written, was not "specific enough to contemplate a situation which either an actual officer or an impersonating officer would assert authority." Therefore, according to the prosecutor,

43

"the rather bland definition of 'fear' as is written in the instruction doesn't contemplate this situation."

Defendant asserted that CALCRIM No. 1600 sufficiently and appropriately defined fear as fear of injury to the person.

The trial court denied the People's request to add the proposed language to CALCRIM No. 1600. The court expressly noted that *Majors* was not a robbery case. Rather the case involved charges of kidnapping, rape, kidnapping for rape, assault with intent to rape and false imprisonment. The court further noted that the CALCRIM No. 1600 commentary states that "fear was not defined because its definition in the context of robbery is commonly understood." However, the trial court stated that this "doesn't mean that it cannot be argued that the circumstances that are suggested by the People amount to fear and/or force, but I decline to instruct the jury on that."

During his closing argument, the prosecutor projected for the jury a slide which displayed the modified CALCRIM No. 1600 instruction he had proposed but which the court had refused to give. The slide also contained a case citation to *Majors*.[17] According to defense counsel, the slide was displayed for approximately three minutes. Defense counsel objected, and, during a subsequent colloquy, asserted that the prosecutor's actions were prejudicial, and moved for a mistrial. Defense counsel asserted that both the case citation and the disputed language constituted prosecutorial misconduct.

In opposing defendant's motion for a mistrial, the prosecutor relied on the fact that the language he had proposed to add to the instruction, and which appeared on the slide,

---

[17] According to defense counsel, the slide showed the elements of robbery and the last element stated the following in quotation marks: " 'The threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced. Thus, the use of force is implicit when arrest is threatened.' *People v. Gaylon Majors* (2004) 33 Cal.4th 321, 331."

44

was quoted from a California Supreme Court case.  The prosecutor stated that he was "not aware of any authority that says that the law cannot be argued to the jury." Additionally, the prosecutor stated that he removed the slide immediately once instructed to do so by the court.[18]  The prosecutor also emphasized that the trial court had expressly stated that he could argue his theory of force or fear to the jury, and contended that projecting it onto a screen was no different than arguing it.

The trial court deferred ruling on the motion, and the parties resumed argument on the issue the following morning.  Defendant emphasized that the prosecutor had displayed a statement of law that was not the law on which the court had agreed to instruct the jury, and reiterated that the trial court had expressly declined to modify the jury instructions with the language advocated by the prosecutor.  While defendant acknowledged that the trial court had specifically allowed the prosecutor to argue his theory of force or fear to the jury, defendant asserted that the trial court had not stated that the prosecutor could cite case law or quote from it.  Defendant asserted that "it is not part of the jury instructions, it is not part of the law that the jury was to consider, it's misconduct, and I move for a mistrial."

The prosecutor stated that he had been unable to locate any case stating that it is improper to quote case law.  The prosecutor also reiterated that the trial court had stated that he would be allowed to argue his theory of force or fear, and asserted that there "was no limitations put on that."  The prosecutor contended that what appeared on the display was a correct statement of law.  As for the fact that the display included a case citation, the prosecutor asserted that the jurors, none of whom were employed in the legal profession, would not know what a case citation was even if they did, in fact, see it.

---

[18]  The prosecutor further noted that, once the trial court instructed him to remove the slide, he altered it.  The slide as it was originally displayed to the jury was not made a part of the record on appeal.

Additionally, the prosecutor noted that, traditionally, prosecutors have wide latitude to quote from books, including the Bible. From this, the prosecutor asserted that it would be "odd" if he were not allowed to quote from California Supreme Court case law.

The trial court denied defendant's motion for a mistrial. The court reiterated the two reasons it had given for its ruling during the instruction conference. The court acknowledged that it had allowed the prosecutor to argue his theory of force or fear, and therefore stated that the prosecutor had not violated the court's ruling on the matter. The court stated that its greater concern was the fact that the case citation appeared in the slide displayed for the jury. Although the trial court acknowledged that counsel are afforded wide latitude in arguing to the jury, including quoting case law or other relevant texts, the court characterized the case citation as being of "questionable propriety." The court stated that it could not be known whether any of the jurors saw the case citation or understood its significance. Additionally, the court relied on the fact that the jury is instructed that, where the attorneys' comments on the law conflict with the court's instructions, the jury must follow the court's instructions. Based on these considerations, the court denied defendant's motion for a mistrial.

### B. Defendant's Contentions

Defendant asserts that the prosecutor committed misconduct in displaying for the jury the slide with the language that had been rejected by the trial court as well as the case citation. Defendant asserts that this misconduct undermined his right to a fair trial. We conclude that, while the prosecutor did indeed commit misconduct, defendant was not prejudiced as a result.

### C. Standard of Review

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' "

46

[Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 671 (*Williams*).)

### D. Analysis

We agree with defendant that the prosecutor committed misconduct. The prosecutor displayed language from *Majors, supra*, 33 Cal.4th at page 331, on a slide depicting a jury instruction, leaving the impression it was part of the jury instruction and the law the jury was to apply to the case. As we have noted, *Majors* provides no guidance to the fear of injury element relevant to a robbery charge. Nor does it address force in a robbery context. The trial court correctly rejected the requested modification. Additionally, by including the case citation, the prosecutor implied a certain weight of authority to the language, and it seems that the prosecutor knew as much; otherwise he would not have included it in the slide. To the extent that the prosecutor misstated the law applicable to the case, the prosecutor committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435 [it is misconduct for the prosecutor to misstate the applicable law].)

We conclude that, by offering this language as part of the jury instruction , which the trial court had expressly and correctly rejected, as well as the case citation, the prosecutor committed misconduct. However, we further conclude that defendant was not prejudiced as a result.

The trial court instructed the jury pursuant to CALCRIM No. 200: "You must follow the law as I explain it to you even if you disagree with it. [¶] If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200, as given.) A written copy of the instructions was provided for the jury's use in the deliberation room. "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Defendant acknowledges that the jury was so instructed. However, defendant asserts that, because the trial court did not provide the jurors with a definition of force, the prosecutor's comment did not "conflict" with the trial court's instructions. It is true that the trial court did not expressly define force for the jury. However, in addition to instructing the jury that, in the event of a conflict between the court's instructions and the attorneys' comments on the law, the jurors were required to follow the court's instructions, the court also stated that the jury "must follow the law as I explain it to you . . . ." (CALCRIM No. 200, as given.) The court instructed the jury, pursuant to CALCRIM No. 1600, as to each element that must be established to sustain a conviction of robbery. According to defense counsel, the prosecutor's slide was shown for only three minutes and it seems unlikely the jury would remember it, let alone rely on it, after having heard the court's instructions and been provided with a written copy. Moreover, the jury asked no questions on the force or fear element or otherwise indicated any confusion about the element.

Second, contrary to the manner in which defendant characterizes it, the language improperly employed by the prosecutor did not actually define force for the jury. It did

state that "the use of force is implicit when arrest is threatened." However, we conclude that this neither defined force as an element of robbery, nor, contrary to defendant's contention, conveyed to the jury that, in this case, the element of the use of force or fear had been established. Therefore, contrary to defendant's contention, neither the prosecutor's misconduct nor the trial court's denial of his motion for a mistrial deprived him of his "rights to a fair trial, to an unbiased jury, [or] to due process and a reliable determination of guilt . . . in violation of the Fifth, Sixth, and Fourteenth Amendments." Moreover, as we have discussed *ante*, there was sufficient evidence of actual force to support the robbery convictions.

Under the circumstances here, we see no reasonable likelihood that the jury construed or applied the complained-of remarks in an objectionable fashion. (*Williams, supra*, 56 Cal.4th at p. 671.)

## V. Section 667, Subdivision (a)(1), Enhancements

## A. Surplus Enhancement Allegations

Defendant asserts that the trial court erred in imposing an enhancement pursuant to section 667, subdivision (a)(1), on counts 1 and 2 and imposing and staying such an enhancement on count 3. Defendant asserts that the enhancement may only be imposed once on a determinate sentence and that the extra enhancement allegations on counts 2 and 3 must be struck. Defendant acknowledges that he did not raise this issue at sentencing, but asserts that, because the sentence imposed is an unauthorized sentence, the issue may be raised at any time. The People concede and we agree.

Section 667, subdivision (a)(1), provides: "In compliance with subdivision (b) of Section 1385, any person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year

49

enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

At sentencing, the trial court denied defense counsel's request that the court impose only one section 667, subdivision (a)(1), enhancement on defendant's determinate sentence. The trial court stated that it did not believe it had the authority to do so. The trial court imposed five-year terms pursuant to section 667, subdivision (a)(1), on counts 1 and 2, and imposed and stayed the same enhancement allegation on count 3.

In *People v. Sasser* (2015) 61 Cal.4th 1 (*Sasser*), our high court held that a "prior serious felony enhancement may be added only once to multiple determinate terms imposed as part of a second strike sentence." (*Id*. at pp. 6-7.) Our high court revisited the distinction drawn in section 1170.1 "between offense-based enhancements, which apply to every relevant count, and status-based enhancements, which apply only once," and observed that the structure set forth in section 1170.1, subdivision (a), " 'makes it very clear that enhancements for prior convictions do not attach to particular counts but instead are added just once as the final step in computing the total sentence.' " (*Sasser*, at p. 15.)

*Sasser* is controlling here. As defendant asserts, and as the People correctly concede, the trial court should have applied the prior serious felony enhancement pursuant to section 667, subdivision (a)(1), only once to defendant's determinate sentence. (*Sasser, supra*, 61 Cal.4th at pp. 6-7.) Therefore, we strike the section 667, subdivision (a)(1), enhancements imposed on count 2 and imposed and stayed on count 3.

### B. Senate Bill 1393

Senate Bill 1393, effective January 1, 2019, amended sections 667 and 1385 to give sentencing courts the discretion to strike a defendant's five-year prior serious felony conviction enhancement under section 667, subdivision (a). At the time defendant was sentenced in this matter, the statutes did not permit a sentencing court to strike a prior

50

serious felony conviction enhancement.  (See former §§ 667, subd. (a)(1), 1385, subd. (b).)

Defendant filed a supplemental brief, asserting that, in light of Senate Bill 1393, the matter must be remanded to the trial court to permit that court to consider whether to exercise its discretion to strike the section 667, subdivision (a), prior serious felony conviction enhancement.  In their supplemental brief, the People did not oppose defendant's request.

In *People v. Garcia* (2018) 28 Cal.App.5th 961 (*Garcia*), the Court of Appeal for the Fourth Appellate District, Division Two, held that, under the rule in *In re Estrada* (1965) 63 Cal.2d 740, "it is appropriate to infer, as a matter of statutory construction, that the Legislature intended S.B. 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when S.B. 1393 becomes effective on January 1, 2019."  (*Garcia*, at p. 973.)  We agree with the *Garcia* court's analysis and thus, we accept the People's concession that Senate Bill 1393 applies retroactively to cases not yet final as of the legislation's effective date.

Because we are remanding the matter in any event (see part VIII. of the Discussion, *post*), we need not discuss the issue further here.  We shall direct the trial court to consider whether to exercise its discretion to strike the section 667, subdivision (a), prior serious felony conviction enhancement on remand.

## VI.  Section 667.5, Subdivision (b), Enhancement

### A.  Additional Background

At the sentencing hearing, but prior to sentencing defendant on his current convictions, the trial court granted defendant's petition pursuant to section 1170.18 to redesignate his 2000 conviction of burglary in the second degree (§§ 459, 460) a misdemeanor.  This prior conviction and its resulting prior prison term served as the basis for the enhancement allegation pursuant to section 667.5, subdivision (b), that defendant had served a prior prison term.  After granting defendant section 1170.18 relief, the trial

51

court proceeded to sentence defendant on the current convictions.  The trial court imposed a term of one year for the section 667.5, subdivision (b), prior prison term enhancement.

## B.  Defendant's Contentions

Defendant asserts that the trial court erred in imposing the section 667.5, subdivision (b), enhancement because the prior conviction had been redesignated a misdemeanor pursuant to Proposition 47, the Safe Neighborhoods and Schools Act (Proposition 47).  Defendant contends that, upon being granted Proposition 47 relief, his prior felony conviction became a misdemeanor "for all purposes."  (§ 1170.18, subd. (k).)  Therefore, at the time his current sentence was imposed, that prior conviction no longer qualified as a basis supporting the section 667.5, subdivision (b), enhancement.  According to defendant, the enhancement must be struck.  We agree.

## C.  Analysis

While the appeal in the instant case was pending, our high court resolved this issue in *People v. Buycks* (2018) 5 Cal.5th 857 (*Buycks*).  Our high court held that the resentencing of a prior underlying felony conviction to a misdemeanor conviction under Proposition 47's section 1170.18 negates an element required to support a section 667.5 one-year enhancement.  (*Buycks*, at p. 889.)  The prior prison enhancement must be struck.  (*Id*. at p. 888.)

## VII.  Section 654

Defendant asserts that the trial court erred in failing to stay the execution of the sentences imposed on counts 7, 8, and 9 pursuant to section 654.  Defendant asserts that counts 4 (possession of a controlled substance) and 7 (possession of controlled substance paraphernalia) were committed in pursuit of the same criminal objective—consuming rock cocaine.  Defendant also asserts that counts 1 (first degree robbery) and 8 (impersonating an officer) and counts 2 (second degree robbery) and 9 (impersonating an officer) were each committed pursuant to the same criminal objective—effectuating a

52

robbery. Accordingly, defendant asserts that the execution of the sentences imposed on counts 7, 8, and 9, should have been stayed pursuant to section 654.

Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

"[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor. [Citation.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Perez* (1979) 23 Cal.3d 545, 551 (*Perez*).) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*Ibid*., fn. omitted.)

We agree with defendant that the sentences imposed on counts 8 and 9 should have been stayed. Those counts, by which defendant was convicted of impersonating an officer (§ 146a, subd. (a)), were based on the same two incidents which resulted in the two robbery convictions, counts 1 (first degree robbery; §§ 211, 212.5, subd. (a)) and 2 (second degree robbery; §§ 211, 212.5, subd. (c)). In each instance, defendant impersonated a police officer as a means of accomplishing the taking of property from the victims, J.T. and J.N. Impersonating a police officer as the means by which to accomplish the taking of property from the victims constituted "a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction." (*Perez, supra*, 23 Cal.3d at p. 551.) In each case, the impersonation of an

53

officer and the robbery were "incident to one objective," and, therefore, "defendant may be punished for any one of such offenses but not for more than one." (*Ibid.*)

Therefore, we agree with defendant that the execution of the sentences imposed on counts 8 and 9 must be stayed pursuant to section 654.

We agree with the People, however, that, contrary to defendant's contention, the execution of the sentence imposed on count 7 need not be stayed pursuant to section 654.

On count 4, defendant was convicted of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)) based on his possession of rock cocaine. On count 7, defendant was convicted of possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1) based on his possession of a glass smoking pipe which, according to Fellows, would be used for smoking rock cocaine or methamphetamine. The trial court sentenced defendant to a concurrent term of one year in county jail on his misdemeanor conviction on count 4, and a concurrent term of six months in county jail on count 7.

The glass pipe could be used to smoke rock cocaine long after defendant exhausted the rock cocaine which was the subject of his conviction on count 4. Moreover, according to Fellows, defendant could use the pipe to smoke methamphetamine, which would be altogether unrelated to the rock cocaine discovered in the hotel room. Defendant acknowledged in his testimony that he "used to be a user of methamphetamine . . . ." Therefore, the objectives involved in defendant's possession of a controlled substance and his possession of controlled substance paraphernalia are legally and factually divisible, the two crimes were independent of each other and not merely incidental to each other, and, therefore, defendant may be punished for both convictions. (*Perez, supra*, 23 Cal.3d at p. 551; see *People v. Maese* (1980) 105 Cal.App.3d 710, 728 [section 654 does not apply to sentences imposed for convictions of possession of a controlled substance and being under the influence].)

Thus, we conclude that the trial court was not required to stay execution of the sentence imposed on count 7 pursuant to section 654.

## VIII.  Error on the Abstract of Judgment/Correction of Sentence on Count 3

Defendant requests that we correct the abstract of judgment to indicate that the sentence imposed on count 3 was stayed by the trial court.  The People concede the error on the abstract of judgment, and we agree.

At sentencing, on count 3, burglary in the first degree (§§ 459, 460, subd. (a)), the trial court sentenced defendant to the middle term of two years eight months.  The court also imposed a sentence of five years for the enhancement pursuant to section 667, subdivision (a)(1).  However, the trial court found that defendant's conduct in committing the burglary "is included largely in the robbery in Count 1, so I stay that 32 month sentence and 5 year enhancement under 654."

The abstract of judgment indicates that, on count 3, the trial court sentenced defendant to a consecutive middle term of two years eight months.  The abstract does not indicate that this sentence was to be stayed pursuant to section 654.  As defendant observes, "ordinarily, if the defendant commits both burglary and the underlying intended felony,  . . . section 654 will permit punishment for one or the other but not for both." (*People v. Centers* (1999) 73 Cal.App.4th 84, 98.)

However, while the court was correct in staying execution of the sentence it imposed as to count 3, it erred in imposing one-third the midterm.  "The one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654." (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164 (*Cantrell*); see also *People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 530; *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197.)  The trial court must impose a full-term sentence and then stay execution thereof.  The purpose of staying execution is to prevent a defendant from receiving " 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*People v. Salazar*

55

(1987) 194 Cal.App.3d 634, 640.) If a conviction on the principal term, here robbery in the first degree, were ever overturned, a *full-term* sentence on the stayed term would come into effect. (*Cantrell*, at p. 1164.) This ensures that a "defendant's punishment is commensurate with his criminal liability." (*Ibid.*)

On remand, the trial court will select a full-term sentence from the triad for burglary in the first degree, impose that term, and stay execution of the sentence on that count pursuant to section 654.

## DISPOSITION

The judgment is modified to: (1) strike the section 667, subdivision (a)(1), enhancements imposed on count 2 and imposed and stayed on count 3; (2) strike the section 667.5, subdivision (b), enhancement; and (3) stay execution of the sentences imposed on counts 8 and 9 pursuant to section 654. The matter is remanded for the trial court to determine whether it should exercise its newly authorized discretion to dismiss or strike the remaining section 667, subdivision (a)(1), enhancement pursuant to section 1385, and to select and impose a full-term sentence on count 3, burglary in the first degree, and then stay execution of that sentence pursuant to section 654. As modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment to reflect these modifications, the trial court's new sentencing, and to indicate stayed execution of the sentences imposed on all counts stayed pursuant to section 654.  The trial court is further directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


               /s/
             MURRAY, J.


We concur:


   /s/
BLEASE, Acting P. J.


   /s/
HULL, J.